IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

GOOGLE INC.,

     Plaintiff,

     v.

ROCKSTAR CONSORTIUM U.S. LP,
MOBILESTAR TECHNOLOGIES, LLC,

     Defendants.

_____/

No. C 13-5933 CW

ORDER DENYING
MOTION TO DISMISS
OR, IN THE
ALTERNATIVE, TO
TRANSFER

(Docket No. 20)

Google Inc. filed this declaratory judgment action for non-infringement of seven patents owned by Defendants Rockstar Consortium U.S. LP (Rockstar) and MobileStar Technologies, LLC (MobileStar). Defendants now move to dismiss or, in the alternative, to transfer the action to the Eastern District of Texas, where the action could be consolidated with several other actions filed by Defendants against Google's customers. Google opposes the motion or, in the alternative, requests jurisdictional discovery. The Court held oral argument on March 13, 2014. After considering the papers and the arguments of counsel, the Court DENIES the motion to dismiss or transfer.

BACKGROUND

Google is a corporation located in Mountain View, California. Docket No. 1 ¶ 2. Google produces the Android mobile platform, an open-source operating system that is used by many original equipment manufacturers around the world. Id. at ¶¶ 1-2.

Nortel Networks was a prominent Canadian telecommunications provider headquartered in Ottawa, Canada.  See Madigan Decl., Exs. 1-2.  Nortel had offices throughout the United States, including one in Santa Clara, California.  See id., Ex. 2.  On January 14, 2009, Nortel filed for bankruptcy.  Id., Exs. 3-4.  The bankruptcy court ordered an auction of Nortel's patent licensing operations, including a portfolio of over 6,000 patents "spanning wireless, wireless 4G, data networking, optical, voice, internet, service provider, semiconductors" and many other aspects of telecommunications and Internet search.  Id., Exs. 4-6.  Around the same time, five of the world's largest technology companies -- Apple, Microsoft, Research in Motion, Sony, and Ericsson -- jointly created and funded an entity called "Rockstar Bidco LP," a Delaware limited liability partnership.  See id., Exs. 7-8.  Apple contributed approximately $2.6 million to Rockstar Bidco.  Id., Ex. 9 at 34.  Both Google and Rockstar Bidco bid on the Nortel patent licensing operation at the June 2011 auction, but Rockstar Bidco ultimately prevailed with a bid of $4.5 billion.  Id., Ex. 7.

Rockstar Bidco transferred around 2,000 patents to its owners, with at least 1,147 going to Apple.  Id., Exs. 7, 14. Rockstar Bidco then reorganized itself into Rockstar, a Delaware limited partnership which claims a principal place of business in

Plano, Texas.  Id., Exs. 7, 15.[1]  Led by former Nortel executive
and current Rockstar CEO John Veschi, Nortel's patent portfolio
and licensing team of about forty employees immediately moved to
Rockstar.  Id., Exs. 10-12.  Rockstar's CFO and CTO had also been
executives at Nortel.  Id.  Veschi and the rest of his team remain
in Nortel's old headquarters in Ottawa, Canada.  Id., Ex. 12.
According to its own website, Rockstar produces no products, but
operates a "patent licensing business that owns and manages a
portfolio of more than 4,000 patents developed by" Nortel.  Id.,
Ex. 13.

Rockstar has worked with Mark Wilson, an independent
contractor in California who provides Rockstar with "licensing
consulting services."  Dean Decl. ¶ 34.  In Rockstar organization
charts appearing in a news article to which Rockstar contributed
and which it featured on its own website, Wilson was named as a
"licensing executive" in senior management.  Madigan Decl., Exs.
12-13.  This suggestion of an employee relationship has now been
deleted from the website and Wilson has removed "Rockstar
Consortium" from his professional profile.  See id., Exs. 12-13,

---

[1] Although Defendants assert that they both have principal
places of business in Texas, they have not named any executives or
employees who reside or work there.  Rockstar's website and the
declaration of Afzal Dean, Rockstar Vice President and President
of MobileStar, identifies officers and board members who represent
both Defendants and who are almost all based in Canada, except one
in Colorado.  See, generally, Dean Decl; see also Madigan Decl.,
Exs. 10, 19, 23.  Rockstar's "nerve center," or the place where
its "officers direct, control, and coordinate the corporation's
activities," thus appears to be in Ottawa, Canada.  Hertz Corp. v.
Friend, 559 U.S. 77, 92-93 (2010).

37.  Defendants assert that Wilson's patent licensing duties do not encompass enforcement of the patents-in-suit.

On October 30, 2013, Rockstar created MobileStar, a wholly-owned subsidiary and Delaware limited liability corporation claiming a principal place of business in Plano, Texas.  Dean Decl. ¶ 5.  A day later, on October 31, 2013, Defendants filed suit in the Eastern District of Texas against ASUS, HTC, Huawei, LG, Pantech, Samsung, and ZTE, alleging each company infringes seven patents: U.S. Patent Nos. 6,037,937 (the '937 patent), 6,463,131 (the '131 patent), 6,765,591 (the '591 patent), 5,838,551 (the '551 patent), 6,128,298 (the '298 patent), 6,333,973 (the '973 patent), and 6,937,572 (the '572 patent). (the Halloween actions).  In each of the Halloween actions, Rockstar and MobileStar alleged infringement by "certain mobile communication devices having a version (or adaptation thereof) of Android operating system," which is developed by Google.  See Dean Decl., Exs. A-H.  Rockstar owns two of the seven patents-in-suit and transferred the remaining five patents to MobileStar shortly before filing litigation, but retained an exclusive license to those patents.  See Dean Decl. ¶¶ 5, 15, 24.

On December 23, 2013, Google filed the present action in the Northern District of California.  In this action, Google seeks a declaration that its Android platform and products (the Nexus 5, Nexus 7, and Nexus 10) do not infringe the seven patents held by Defendants that were asserted in the Halloween actions.  See Docket No. 1.

On December 31, 2013, Defendants responded with a New Year's Eve amendment to one of the Halloween actions to include

allegations that Google infringes three of the asserted patents at issue in this case: the '937, '131, and '591 patents.  Rockstar v. Samsung, Case No. 13-0900 (E.D. Tex.), Docket No. 19.  Defendants did not, however, assert that Google infringed the four additional patents at issue in the Halloween actions and in this case: the '551, '298, '973, and '572 patents.  See id.  On March 10, 2014, Defendants moved to amend their complaint in the Texas case to allege that Google infringed these four additional patents.  Case No. 13-0900, Docket Nos. 45-46.

LEGAL STANDARDS

Under Rule 12(b)(2) of the Federal Rules of Civil Procedure, a defendant may move to dismiss for lack of personal jurisdiction.

In a declaratory action for non-infringement, because the jurisdictional issue is intimately connected with substance of patent laws, Federal Circuit law applies.  Avocent Huntsville Corp. v. Aten Int'l Co., Ltd., 552 F.3d 1324, 1328 (Fed. Cir. 2008).

Where the court decides the personal jurisdiction question based on affidavits and other written materials, and without an evidentiary hearing, a plaintiff need only make a prima facie showing that a defendant is subject to personal jurisdiction.  Nuance Commc'ns, Inc. v. Abbyy Software House, 626 F.3d 1222, 1231 (Fed. Cir. 2010); Electronics For Imaging, Inc. v. Coyle, 340 F.3d 1344, 1349 (Fed. Cir. 2003).  Uncontroverted allegations in the complaint must be taken as true.  Id.  If both the plaintiff and the defendant submit admissible evidence, conflicts in the evidence must be resolved in the plaintiff's favor.  Trintec

Indus., Inc. v. Pedre Promotional Products, Inc., 395 F.3d 1275, 1282 (Fed. Cir. 2005).

There are two independent limitations on a court's power to exercise personal jurisdiction over a non-resident defendant: the applicable state personal jurisdiction rule and constitutional principles of due process. Electronics For Imaging, Inc., 340 F.3d at 1349. Because California's jurisdictional statute is co-extensive with federal due process requirements, jurisdictional inquiries under state law and federal due process standards merge into one analysis. Id.

The "constitutional touchstone" for the exercise of personal jurisdiction "remains whether the defendant purposefully established minimum contacts" in the forum state such that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985); Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). Although the application of this doctrine has evolved to keep pace with the increasingly national and international nature of modern business affairs, the Supreme Court has repeatedly stressed that there must always be "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." Avocent Huntsville Corp., 552 F.3d at 1329 (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)). "This purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the

unilateral activity of another party or a third person." Id. (quoting Burger King Corp., 471 U.S. at 475).

Personal jurisdiction may be either general or specific. General jurisdiction exists when the defendant maintains "continuous and systematic" contacts with the forum state, even if the cause of action is unrelated to those contacts. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 415-16 (1984). Specific jurisdiction is satisfied where the defendant has "purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." Burger King Corp., 471 U.S. at 472.

I.   Personal Jurisdiction over Rockstar through MobileStar

As a preliminary matter, Defendants argue that jurisdiction over Rockstar and MobileStar should be assessed independently because they are separate corporate entities. Google disagrees, contending that Rockstar's contacts should be imputed to MobileStar.

The Court must begin from "the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception." 3D Sys., Inc. v. Aarotech Labs., Inc., 160 F.3d 1373, 1380 (Fed. Cir. 1998). One exception is where the parent and subsidiary are not really separate entities and are alter egos of each other. Doe v. Unocal Corp., 248 F.3d 915, 926 (9th Cir. 2001); see also Danjaq, S.A. v. Pathe Commc'ns Corp., 979 F.2d 772, 775 (9th Cir. 1992) (finding that many courts have discussed whether a parent's citizenship can be imputed to the subsidiary and recognized that it can where the

subsidiary is the alter ego of the parent).  Courts have invoked

this exception where the plaintiff makes a prima facie case that

(1) there is a unity of interest and ownership such that the

separate personalities of the two entities no longer exist and

(2) failure to disregard the separate identities "would result in

fraud or injustice."  Doe, 248 F.3d at 926.

In a similar situation, the Federal Circuit found that the

parent-subsidiary relationship between a parent company and its

wholly-owned subsidiary holding company justified imputing the

parent company's California contacts to the subsidiary.  Dainippon

Screen Mfg. Co., Ltd. v. CFMT, Inc., 142 F.3d 1266, 1271 (Fed.

Cir. 1998).  The court observed:

> Stripped to its essentials, CFM contends that a parent
> company can incorporate a holding company in another state,
> transfer its patents to the holding company, arrange to have
> those patents licensed back to itself by virtue of its
> complete control over the holding company, and threaten its
> competitors with infringement without fear of being a
> declaratory judgment defendant, save perhaps in the state of
> incorporation of the holding company.  This argument
> qualifies for one of our "chutzpah" awards.  See Refac Int'l,
> Ltd. v. Lotus Dev. Corp., 81 F.3d 1576, 1584, 38 USPQ2d 1665,
> 1671 (Fed. Cir. 1996); Checkpoint Sys., Inc. v. United States
> Int'l Trade Comm'n, 54 F.3d 756, 763 n. 7, 35 USPQ2d 1042,
> 1048 n.7 (Fed. Cir. 1995) (noting that "chutzpah" describes
> "the behavior of a person who kills his parents and pleads
> for the court's mercy on the ground of being an orphan").

Id. (reversing district court's finding that it lacked personal

jurisdiction because of CFMT, the newly-formed subsidiary).  With

these observations in mind, the Federal Circuit determined that it

would be "reasonable and fair" to find jurisdiction over both CFM

and CFMT because of their parent-subsidiary relationship.  Id.

The court reasoned that, while a "patent holding subsidiary is a

**United States District Court**
For the Northern District of California

legitimate creature . . . , it cannot fairly be used to insulate

patent owners from defending declaratory judgment actions in those

fora where its parent company operates under the patent and

engages in activities sufficient to create personal jurisdiction

and declaratory judgment jurisdiction." Id.[2]

The facts in this case are at least as strong as those in

Dainippon. As in Dainippon, MobileStar here had some contact with

the forum state: it met with Google in California to attempt to

negotiate a license. See id. ("Moreover, CFMT's attempts to

negotiation a sublicense with Dainippon in California further

strengthen CFMT's contacts with that state."). More

fundamentally, as in Dainippon, the circumstances here strongly

suggest that Rockstar formed MobileStar as a sham entity for the

sole purpose of avoiding jurisdiction in all other fora except

MobileStar's state of incorporation (Delaware) and claimed

principal place of business (Texas). A mere day before it

initiated litigation against Google's customers, Rockstar freshly

minted MobileStar, with no California contacts, and assigned the

---

[2] Defendants initially attempted to argue that Dainippon's holding was based "first and foremost" on its determination "that the subsidiary itself had minimum contacts with the forum, and those contacts (not the parent's contacts) justified the imposition of personal jurisdiction," insinuating the rest was dicta. Defendants' Reply at 3 (internal quotation marks and italics omitted). However, Defendants later conceded that Dainippon stood for the proposition that one valid ground for setting aside corporate formalities for purposes of assessing the interests of fair play and substantial justice was if the defendants engaged in "a deliberate attempt to manipulate jurisdiction." Id. at 4.

asserted patents to that subsidiary.  Dean Decl. ¶ 15.  Other

evidence suggesting MobileStar maintains no independent identity

is the fact that all MobileStar employees also work for Rockstar.

MobileStar has three officers (President Afzal Dean, Vice

President Chad Hilyard, and Corporate Secretary Mike Dunleavy) and

one board member (Director of the Board John Veschi); all serve on

Rockstar's board as well.  Dean Decl. ¶ 10.  MobileStar

purportedly operates out of the same office suite listed for

Rockstar.  Dean Decl. ¶¶ 5, 15.  Although Rockstar asserts that

"there is no hint whatsoever of any manipulation" and that

"MobileStar was created for legitimate reasons having nothing to

do with personal jurisdiction," Rockstar does not actually provide

any evidence supporting this point.  Defendants' Reply at 4.

Because the evidence presented supports Google's allegation that

Rockstar created MobileStar solely to dodge jurisdiction, the

traditional notions of fair play and justice would not be offended

if the Court considers the two entities jointly for purposes of

jurisdiction and imputes Rockstar's contacts to the forum state to

MobileStar.[3]

---

[3] Cf. In re Microsoft, 630 F.3d 1361, 1364-65 (Fed. Cir.
2011) (for purposes of a motion to transfer, ignoring the impact
of litigation-driven incorporation under the laws of Texas, which
occurred sixteen days before filing suit); In re Zimmer Holdings,
Inc., 609 F.3d at 1381 (rejecting connections to Texas as "recent,
ephemeral, and an artifact of litigation").

II.  General Jurisdiction

General, or "all-purpose" personal jurisdiction, subjects a defendant to suit in a forum only where a defendant's contacts with that forum "are so continuous and systematic as to render them essentially at home in the forum State." Daimler AG v. Bauman, 134 S. Ct. 746, 754 (2014) (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S. Ct. 2846, 2851 (2011)).  The "paradigm bases for general jurisdiction" for a corporation are its place of incorporation and principal place of business.  Id. at 760.

Both Rockstar and MobileStar are incorporated in Delaware and claim to have principal places of business in Plano, Texas.  Dean Decl. ¶ 5, 15.  Neither Defendant is licensed to do business in California, nor do they own real or personal property, pay taxes, maintain offices, or file lawsuits in California.  Dean Decl. ¶¶ 6-9, 16, 22-24, 29-33.

Google nevertheless contends that Rockstar has stepped in the shoes of its predecessor, Nortel, and assumed its jurisdictional position.[4]  Although Nortel was a Canadian company, it maintained

---

[4] See Doe, 248 F.3d at 926 (explaining requirements for alter ego theory and agency theory for imputing contacts of one corporation to another).  See also Katzir's Floor & Home Design, Inc. v. M-MLS.com, 394 F.3d 1143, 1150 (9th Cir. 2004) ("The general rule of successor liability is that a corporation that purchases all of the assets of another corporation is not liable for the former corporation's liabilities unless, among other theories, the purchasing corporation is a mere continuation of the selling corporation.").

its primary United States campus in Santa Clara and designated a

registered agent for service of process in California.  See

Madigan Decl., Exs. 3, 27.  Nortel routinely brought suits and

defended them in California.  See, e.g., Times Networks, Inc. v.

Nortel Networks Corp., Case No. 06-00532 (N.D. Cal.) and Nortel

Networks Inc. v. State Bd. of Equalization, 191 Cal. App. 4th 1259

(2011).

Google does not allege that Rockstar maintained Nortel's

Santa Clara presence in California.  Google contends instead that,

although the bulk of Rockstar's employees operate out of Canada,

Rockstar nevertheless pursues a significant patent licensing

business aimed at the technology industry in the Silicon Valley,

in California.  As Rockstar has stated on many occasions to the

press and others, Rockstar is exclusively "a patent licensing

business" and operates by reverse-engineering products on the

market and proposing that the companies which offer those products

purchase licenses.  Madigan Decl., Ex. 7, 13; Dean Decl. ¶¶ 18-21.

Rockstar does not currently sell any products; commercialization

of its significant patent portfolio is its only business.  Because

the Silicon Valley technology industry is Rockstar's main target,

as acknowledged by Rockstar's CEO, Rockstar naturally would have

to come into constant contact with the forum state.  Madigan

Decl., Exs. 16, 35.  Rockstar confirmed that, as of May 2012, it

had "started negotiations with as many as 100 potential licensees"

and has since approached many more.  Id., Exs. 7, 17.  At least a

couple of these meetings were in California.  See Dean Decl. ¶ 18.

Rockstar has one employee or independent contractor in California,

Wilson, who contacts potential licensees in California.  See

Madigan Decl. Ex. 17.

Google's showing is insufficient to render Defendants

"essentially at home" in California.  Even if it is true that

Defendants engage in "continuous and systematic" business in the

forum state, that does not mean that Defendants' presence in the

forum state is so substantial that it should fairly be subject to

suit "on causes of action arising from dealings entirely distinct

from those activities."  Daimler AG, 134 S. Ct. at 761.

II.  Specific Jurisdiction

Specific jurisdiction exists where the cause of action arises

out of the defendant's contacts with the forum state, even if

those contacts are isolated and sporadic.  Red Wing Shoe Co., Inc.

v. Hockerson-Halberstadt, Inc., 148 F.3d 1355, 1359 (Fed. Cir.

1998) (citing Burger King Corp., 471 U.S. at 471-77).  Even a

single act may support a finding of personal jurisdiction so long

as it creates a "substantial connection with the forum, as opposed

to an attenuated affiliation."  Id.  The Federal Circuit has

developed a three-factor test to determine whether specific

jurisdiction exists: "whether (1) the defendant purposefully

directed its activities at residents of the forum state, (2) the

claim arises out of or relates to the defendant's activities with

the forum state, and (3) assertion of personal jurisdiction is

reasonable and fair." Electronics For Imaging, Inc., 340 F.3d at 1350.

Here, Defendants sued seven Google customers, alleging that they infringed by making and selling "certain mobile communication devices having a version (or adaptation thereof) of Android operating system" which is developed by Google. See Dean Decl., Exs. A-H. Both Defendants met with Google in California to discuss licensing of the patents-in-suit. Rockstar also met in California with a few of the Google customers sued in the Halloween actions to discuss licensing of the patents-in-suit. These contacts with Google and its customers in California created a cloud of patent infringement charges over Google's Android platform. Google's causes of action for declaratory judgment of non-infringement, which are intended to "clear the air of infringement charges" targeting Google's Android platform, "arise out of or relate to" Defendants' contacts with the forum. See Red Wing Shoe Co., Inc., 148 F.3d at 1360 (holding that "cease-and-desist letters are the cause of the entanglement and at least partially give rise to the plaintiff's action").

Defendants argue that imposing jurisdiction based on the act of sending cease-and-desist letters alone violates the principles of fair play and substantial justice. Id. The Federal Circuit has explained that exercising personal jurisdiction over a patentee based solely on the sending of cease-and-desist letters would be unfair under the second prong of the traditional due

process inquiry: "whether the maintenance of personal jurisdiction would comport with fair play and substantial justice." <u>Id.</u> at 1361 (quotation marks omitted).  This is because due process "afford[s] the patentee sufficient latitude to inform others of its patent rights without subjecting itself to jurisdiction in a foreign forum." <u>Id.</u>  An offer to license may sometimes be "more closely akin to an offer for settlement of a disputed claim rather than an arms-length negotiation in anticipation of a long-term continuing business relationship," and, if so, by itself may be insufficient to justify exercising specific jurisdiction. <u>Id.</u> Accordingly, to find specific jurisdiction, the Federal Circuit has required that a showing that a defendant engaged in "other activities" in the forum state related to the action at hand. <u>Id.</u>; <u>Avocent Huntsville Corp.</u>, 552 F.3d at 1334.  These activities need not be limited to those directed at Google itself, but must be related in some way to the patents-in-suit. <u>Avocent Huntsville Corp</u>, 552 F.3d at 1334.

Courts have held that such "other activities" may include forming obligations with forum residents that relate to enforcement of the asserted patents.  Some examples of "other activities" that courts have recognized include "initiating judicial or extra-judicial patent enforcement within the forum, or entering into an exclusive license agreement or other undertaking which imposes enforcement obligations with a party residing or

regularly doing business in the forum." Id.[5] A review of Federal

Circuit case law reveals that the relationship must extend beyond

the mere payment of royalties or cross-licensing payments, "such

as granting both parties the right to litigate infringement cases

or granting the licensor the right to exercise control over the

licensee's sales or marketing activities." Breckenridge Pharm.,

Inc. v. Metabolite Labs., Inc., 444 F.3d 1356, 1366 (Fed. Cir.

2006). The defendants must create "continuing obligations between

themselves and residents of the forum," forming a "substantial

connection" that proximately results from the defendants' own

actions such that it would not be "unreasonable to require

defendants to submit to the burdens of litigation in that forum as

well." Electronics For Imaging, Inc., 340 F.3d at 1350.

---

[5] See Campbell Pet Co. v. Miale, 542 F.3d 879, 886 (Fed. Cir. 2008) (finding jurisdiction over a patentee who conducted extra-judicial patent enforcement by enlisting a third party in the forum to remove defendant's products from a trade show); Genetic Implant Sys., Inc. v. Core-Vent Corp., 123 F.3d 1455, 1458 (Fed. Cir. 1997) (holding that specific jurisdiction existed over patentee because it had appointed an in-state distributor to sell a product covered by the asserted patent, which was a business relationship "analogous to a grant of a patent license" and created obligations to sue third-party infringers); Akro Corp. v. Luker, 45 F.3d 1541, 1548-49 (Fed. Cir. 1995) (because defendant had entered into an exclusive licensing agreement with one of the alleged infringer's competitors, which meant that defendant had "obligations . . . to defend and pursue any infringement" against the patent, specific jurisdiction was proper); SRAM Corp. v. Sunrace Roots Enter. Co., Ltd., 390 F. Supp. 2d 781, 787 (N.D. Ill. 2005) (specific jurisdiction was proper where defendant had "purposefully directed its activities" at residents of the forum by marketing a product that directly competed with the alleged infringer).

16

Google contends that Defendants have accepted substantial obligations to Apple, a forum resident, which require Defendants "to defend and pursue any infringement against" their patents. Akro Corp., 45 F.3d at 1543. Google alleges that Apple is a majority shareholder of Defendants and exerts substantial control over them, and as a result Defendants are obliged to act on Apple's behalf in a campaign to attack Google's Android platform.[6]

In support of this allegation, Google submits strong evidence that Apple is indeed the majority shareholder of Defendants based on Apple's majority investment in Rockstar's predecessor entity, Rockstar Bidco.[7] Currently, Rockstar is a Delaware limited partnership which lists "Rockstar Consortium LLC" located in New York as general partner. Id., Exs. 32-33; Dean Decl. ¶ 15. But Apple contributed $2.6 billion, or fifty-eight percent of the $4.5 billion total investment in Rockstar Bidco. Madigan Decl., Ex. 9 at 34. Although Rockstar Bidco reorganized itself to become

---

[6] Defendants contend that Google has not proven that alter ego or agency theories apply, and thus Apple's contacts with the forum cannot be imputed to Defendants. See Defendants' Reply at 11. Defendants misunderstand Google's argument. Google does not seek to impute to Defendants Apple's contacts with the forum state, but instead argues that Defendants have undertaken a substantial obligation to Apple related to the asserted patents that makes it reasonable to impose specific jurisdiction.

[7] As previously noted, Rockstar wholly owns MobileStar and the Court considers the two entities jointly for purposes of jurisdiction because it is likely that MobileStar was created solely for litigation purposes.

Rockstar, it does not appear that any ownership interests changed, nor do Defendants assert otherwise.

Even if Apple is a majority shareholder of Rockstar, if Defendants were able to demonstrate that Apple is a mere passive shareholder and takes no part in patent assertion strategy, then the relationship between Apple and Defendants might not be sufficient to uphold specific jurisdiction. Cf. Breckenridge Pharm., Inc., 444 F.3d at 1366. Google alleges that Apple's role extends beyond the mere receipt of profits. Rockstar's CEO Veschi stated that he does not talk to its shareholders about potential licensing partners or infringement suits, but admitted that he has to show them "progress and that real work is being done." Madigan Decl., Ex. 12 at 4-5. Veschi holds periodic calls and meetings with the owners, primarily with their intellectual property departments, and Veschi acknowledges that they "work well together." Id. at 5. Although Veschi states they avoid talking about details, it does appear at least telling that Veschi speaks directly and periodically with the owners' intellectual property departments to demonstrate that "work is being done." Id. at 4-5.

Google demonstrates a direct link between Apple's unique business interests, separate and apart from mere profitmaking, and Defendants' actions against Google and its customers. Google and

**United States District Court**
For the Northern District of California

Apple's rivalry in the smartphone industry is well-documented.[8] Apple's founder stated that he viewed Android as a "rip off" of iPhone features and intended to "destroy" Android by launching a "thermonuclear war." Id., Ex. 31. Defendants' litigation strategy of suing Google's customers in the Halloween actions is consistent with Apple's particular business interests. In suing the Halloween action defendants, Defendants here limited their infringement claims to Android-operating devices only, even where they asserted a hardware-based patent. See, e.g., Dean Decl., Ex. A and the '551 patent. This "scare the customer and run" tactic advances Apple's interest in interfering with Google's Android business. See Campbell, 542 F.3d at 887 (finding jurisdiction where the patentee "took steps to interfere with the plaintiff's business").

In sum, with conflicts in the allegations and evidence resolved in its favor, Google has shown that it is likely that Defendants have created continuing obligations with a forum resident to marshal the asserted patents such that it would not be unreasonable to require Defendants to submit to the burdens of

---

[8] See, e.g., Madigan Decl., Ex. 24 (Rockstar's "stockpile was finally used for what pretty much everyone suspected it would be used for -- launching an all-out patent attack on Google and Android"); Ex. 25 ("This is an all out assault on Google and the Android smartphone ecosystem and it would be fair to say that most experts expected those patents would rear their ugly head sometime in the future"); Ex. 26 (new attention focused on Rockstar "largely because it gives the appearance that three leading competitors to Android are teaming up against it"); Ex. 27 (further detailing Apple's anti-Android litigation campaign).

litigation in this forum.  Electronics For Imaging, Inc., 340 F.3d
at 1350.  Defendants have purposefully directed activities to
residents of this forum in a way which relates materially to the
enforcement or defense of the patent, which is sufficient to
establish specific jurisdiction.  Avocent Huntsville Corp., 552
F.3d at 1338.[9]

III. Jurisdiction under Declaratory Judgment Act

The Declaratory Judgment Act provides, "In a case of actual
controversy within its jurisdiction, any court of the United
States . . . may declare the rights and other legal relations of
any interested party seeking such declaration, whether or not
further relief is or could be sought."  28 U.S.C. § 2201.  The
declaratory judgment plaintiff must establish that the "facts
alleged under all the circumstances show that there is a
substantial controversy between parties having adverse legal
interests of sufficient immediacy and reality to warrant the
issuance of a declaratory judgment."  Micron Tech., Inc. v. Mosaid
Technologies, Inc., 518 F.3d 897, 901 (Fed. Cir. 2008) (citing
MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 126 (2007)
(holding that there was a real and substantial controversy based
on threatening letters and public statements showing an "intent to
continue an aggressive litigation strategy")).

---

[9] Because the Court finds personal jurisdiction over
Defendants is proper, venue is also proper.  Trintech Indus., 395
F.3d at 1280 ("Venue in a patent action against a corporate
defendant exists wherever there is personal jurisdiction").

Even when declaratory judgment jurisdiction is present, courts have some discretion to decline to exercise that jurisdiction. Wilton v. Seven Falls Co., 515 U.S. 277, 289-90 (1995). In order to decide whether to exercise jurisdiction under the Declaratory Judgment Act, the court "must determine whether hearing the case would serve the objectives for which the Declaratory Judgment Act was created." Capo, Inc. v. Dioptics Med. Products, Inc., 387 F.3d 1352, 1355 (Fed. Cir. 2004). When the objectives of the Declaratory Judgment Act are served by the action, dismissal is rarely proper. Id. "There must be well-founded reasons for declining to entertain a declaratory judgment action." Id.

The present suit serves the purposes of the Declaratory Judgment Act, which "in patent cases is to provide the allegedly infringing party relief from uncertainty and delay regarding its legal rights." Micron Tech., Inc., 518 F.3d at 902. A real and substantial controversy existed when Google filed suit. Defendants had sued a number of Google's customers, based in part

on their use of the Android platform developed by Google.[10]

Defendants did not, however, name Google as a defendant.  This

tactic of targeting the customers instead of the manufacturer

"infects the competitive environment of the business community

with uncertainty and insecurity."  Electronics for Imaging, Inc.

v. Coyle, 394 F.3d 1341, 1346 (Fed. Cir. 2005).  In response to

the uncertainty caused by Defendants' actions, Google filed this

declaratory judgment action to "clear the air of infringement

charges."  Avocent Huntsville Corp., 552 F.3d at 1329.  That

uncertainty still exists in part because, although Defendants

later amended one of the Halloween actions to implicate Google

directly, they accused Google of infringing only three of the

seven of the patents at issue here.  Case No. 13-0900, Docket

No. 19.  Although Defendants recently sought to include the final

four other patents in the Texas case, leave to amend has not yet

---

[10] Defendants filed a Statement of Recent Decision calling the
Court's attention to Microsoft Corp. v. DataTern, Inc., 2013-1184,
2014 WL 1327923 (Fed. Cir. Apr. 4, 2014).  The Federal Circuit
noted that, although suits against customers do not "automatically
give rise to a case or controversy regarding induced
infringement," there is a case or controversy if "there is a
controversy between the patentee and the supplier as to the
supplier's liability for induced or contributory infringement
based on the alleged acts of direct infringement by its
customers."  Id. at *2-3.  The vast majority of the claims brought
in the Halloween actions appear to be targeted specifically at
Android features; the exception is the '551 patent, with which it
is not clear if Android is specifically involved.  It is also not
clear if Defendants approached Google to license the '551 patent.
See id. at *2.  Because the DataTern court had the benefit of
claim charts to discern the details of the patentee's infringement
theories, the Court may revisit the inclusion of the '551 patent
at a later date.

1   been granted.  Case No. 13-0900, Docket Nos. 45-46.  Because the

2   patent owners failed to "grasp the nettle and sue," Google was

3   justified in bringing the present action.  Electronics for

4   Imaging, Inc., 394 F.3d at 1346.

5   IV.   Motion to Transfer

6        A.    First-to-File Rule

7        When cases between the same parties raising the same issues

8   are pending in two or more federal districts, the general rule is

9   to favor the forum of the first-filed action, regardless of

10  whether it is a declaratory judgment action.  Micron Tech., Inc.,

11  518 F.3d at 904.  The court of the actual first-filed case should

12  rule on motions to dismiss or transfer based on exceptions to the

13  first-to-file rule or on the convenience factors.  See id.  The

14  parties dispute which is the first-filed action.  Google argues

15  that the first-filed action is the present suit, which was filed

16  before Google faced charges in the Eastern District of Texas due

17  to Defendants' New Year's Eve amendment.  Defendants argue that

18  the Halloween actions themselves constituted the first-filed

19  suits.  Defendants' Motion to Dismiss at 5, 19-24.  Although the

20  Halloween actions did not name Google specifically, Defendants

21  contend that they should be considered first-filed suits against

22  Google because they involved "substantially the same" parties as

23  those implicated here.  Id. (citing Futurewei Techs., Inc. v.

24  Acacia Research Corp, 737 F.3d 704, 706 (Fed. Cir. 2013)).

25  However, the present situation is not equivalent to the

"substantially similar" parties that were implicated in <u>Futurewei</u>,

which were a patent owner, its exclusive licensee, and the

licensee's wholly-owned subsidiary/assignee.  <u>Id.</u> at 705-06.  By

contrast, the relationship between Google and the Halloween

defendants is one of manufacturer and customer.  Google and the

Halloween defendants are not in privity.  <u>Cf.</u> <u>Microchip Tech, Inc.</u>

<u>v. United Module Corp.</u>, 2011 WL 2669627, at *3 (N.D. Cal.)

("similar" parties were parent and its wholly-owned subsidiary).

Even if the parties were substantially similar in the

Halloween actions and this one, the customer-suit exception to the

first-to-file rule would apply.  <u>Codex Corp v. Milgo Elec. Corp</u>,

553 F.2d 735, 737 (1st Cir. 1977) ("an exception to the first-

filed rule has developed in patent litigation where the earlier

action is an infringement suit against a mere customer and the

later suit is a declaratory judgment action brought by the

manufacturer of the accused devices").  Because the determination

of the infringement issues here would likely be dispositive of the

other cases, and the manufacturer presumably has a greater

interest in defending against charges of patent infringement than

the customers, the present suit takes precedence.  <u>Kahn v. Gen.</u>

<u>Motors Corp.</u>, 889 F.2d 1078, 1081 (Fed. Cir. 1989); <u>Cf.</u>

<u>ContentGuard Holdings, Inc. v. Google, Inc.</u>, Case No. 14-0061

(E.D. Tex.), Docket No. 37, at 6.

B.  Convenience Factors

The Court could make an exception to the general rule giving

24

1  preference the first-filed case if doing so would be "in the

2  interest of justice or expediency, as in any issue of choice of

3  forum." Micron Tech., Inc., 518 F.3d at 904. To resolve disputes

4  of "competing forum interests" between accused infringers and

5  patent holders, the court may consider the "convenience factors"

6  under the transfer analysis of 28 U.S.C. § 1404(a), including: the

7  convenience and availability of witnesses, the absence of

8  jurisdiction over all necessary or desirable parties, the

9  possibility of consolidation with related litigation, and

10  considerations relating to the interests of justice. Id. at 902-

11  05. See Reflex Packaging, Inc. v. Audio Video Color Corp., 2013

12  WL 5568345, at *2 (N.D. Cal.) (listing additional transfer

13  factors).

14              1.    Convenience and availability of witnesses

15        The convenience and availability of witnesses is "probably

16  the single most important factor" in the transfer analysis. In re

17  Genentech, Inc., 566 F.3d 1338, 1343 (Fed. Cir. 2009). This

18  factor favors California because Google's Android products, the

19  target of this infringement action, were designed and created

20  here. Many of the witnesses who can testify to the design and

21  development of the accused Android platform's features reside near

22  Google's headquarters in Mountain View, California. Dubey Decl.

23  ¶¶ 3-8. Other witnesses, such as the inventors of the patents-in-

24  suit, are likely to be in Canada. Defendants do not name any

25  witnesses in Texas essential to the suit.

2.   Jurisdiction over parties to this action and
     possibility of consolidation with related
     litigation

Defendants argue that this Court lacks jurisdiction over some of the customer defendants to the Halloween actions in Texas. Defendants contend those customers necessarily would be indispensable parties to this litigation because their rights in the patents-in-suit are at play.  However, those parties are not essential to resolution of claims between Defendants and Google. It cannot be said that any customer who uses the technology at issue is an indispensable party.

The Halloween actions might not and need not be transferred here.[11]  They might be stayed in Texas and be reopened upon completion of this suit, which likely will resolve some of the infringement issues there.  If the Texas actions are transferred here, they can be consolidated with this case at least for pretrial purposes.

3.   Other factors

Other factors that may be considered include: the plaintiff's choice of forum, the convenience of the parties, the ease of access to the evidence, the familiarity of each forum with the applicable law, the local interest in the controversy, the

---

[11] In each of the remaining Halloween actions, the defendant has filed a motion to stay or, in the alternative, to transfer the case to this district.  See Docket Nos. 46, 48, 50-51, 55.

1  relative court congestion, and the interests of justice.  <u>Reflex</u>

2  <u>Packaging, Inc.</u>, 2013 WL 5568345, at *2.

3  Defendants argue that they are the true plaintiffs and

4  accordingly, their choice of forum should take precedence.  The

5  Court finds this factor at best to favor Defendants only slightly

6  because each side accuses the other of forum shopping.  Indeed,

7  Defendants have not identified any witnesses residing in Texas,

8  their primary operations and headquarters are in Canada, and they

9

10  admit that many of the inventors of the patents-in-suit were

11  listed at least years ago as being from Canada.  Defendants'

12  argument of their own convenience is similarly attenuated because,

13  again, their operations appear to be based in Canada, not Texas.

14  The Northern District of California has the greater interest

15  in this litigation because the claims here will "call into

16  question the work and reputation of several individuals residing

17

18  in or conducting business in this community."  <u>In re Hoffman-La</u>

19  <u>Roche</u>, 587 F.3d 1333, 1336 (Fed. Cir. 2009).  Courts in the

20  Eastern District of Texas have recognized that the "Northern

21  District of California has an interest in protecting intellectual

22  property rights that stem from research and development in Silicon

23  Valley."  <u>Affinity Labs of Texas v. Samsung Elecs. Co., Ltd.</u>, 2013

24  WL 5508122, at *3 (E.D. Tex.).  Although Defendants claim to have

25

26  substantial ties to Texas, their headquarters appear to be in

27  Canada.  The interest of the Eastern District of Texas in this

28

controversy is therefore outweighed by the compelling interests in California.

The remaining factors are either neutral or favor Google. Because Google, the accused infringer, resides in California, much of the evidence is here.  Some of the evidence may be in Canada or other states; however, that does not make Texas the more convenient forum.  Each forum is familiar with patent law, and both have similar court congestion and time to trial.  All of the cases are in early stages.

On balance, the factors do not weigh in favor of transferring the action to the Eastern District of Texas.

CONCLUSION

The motion to dismiss or transfer is DENIED.

IT IS SO ORDERED.

Dated:  04/17/2014

_____
CLAUDIA WILKEN
United States District Judge